IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CRIMINAL ACTION |
| v. | ) | |
| | ) | No. 06-20021-05-KHV |
| VICTOR M. GALVAN II, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

On May 26, 2006, a grand jury returned a 21-count indictment which in part charged Victor M. Galvan II with conspiracy to possess more than 50 grams of methamphetamine with intent to distribute, conspiracy to possess more than 500 grams of cocaine with intent to distribute, conspiracy to possess marijuana with intent to distribute, and possession of more than five grams of methamphetamine with intent to distribute.  Law enforcement officers discovered part of the methamphetamine on defendant's person after they stopped a car which he was driving on December 19, 2005.  This matter is before the Court on Defendant's Motion To Suppress Evidence And Statements (Doc. #112) filed March 29, 2006.  On July 19 and August 21, 2006, the Court held an evidentiary hearing.  For reasons set forth below, defendant's motion is overruled.

## Factual Background

Based on the testimony and exhibits at the hearing on defendant's motion, the Court finds the following facts:

On November 2, 2005, a Confidential Source (CS-1) provided information to the Drug Enforcement Administration (DEA) which was investigating methamphetamine trafficking in Kansas City,

Kansas. CS-1 made a controlled purchase from Hugo Lechuga of one ounce of methamphetamine for $900.00. During the controlled purchase, officers observed Lechuga approach another individual (later identified as Kenet Del Cid-Rendon) who supplied the methamphetamine for the controlled purchase.

A second confidential source (CS-2) advised DEA agents that Hector Moreira was selling methamphetamine from Los Compadres Bar and Grill at 4752 State Avenue, Kansas City, Kansas. On December 19, 2005, CS-2 participated in a controlled purchase of four ounces of methamphetamine from Moreira. Deputy Sheriff Jesse Valdez, who was acting in an undercover capacity, drove CS-2 to Los Compadres where they arrived at approximately 7:25 p.m. At the restaurant, Deputy Valdez remained in the car while CS-2 phoned Moreira to get further instructions for the purchase. CS-2 told Moreira that he was parked in the lot in a gold Nissan. CS-2 then waited in the vehicle along with Deputy Valdez while they observed an unknown male driving a grey Ford pickup meet with a Hispanic male in a dark colored Dodge Durango. The unknown male was then observed leaving the parking lot in the Ford pickup. CS-2 then exited the vehicle, walked to the Dodge Durango, which was occupied by two Hispanic males, and entered the rear passenger seat. After several minutes, CS-2 departed the Durango and returned to Deputy Valdez's vehicle, which left the parking lot at approximately 7:30 p.m. Following the controlled purchase, CS-2 gave officers four individual baggies containing 44.6 grams of "ice" methamphetamine.

CS-2 reported to agents that two individuals were in the Durango and that he had purchased methamphetamine from these same individuals on prior occasions. Based on CS-2's description, agents identified one of the individuals as Del Cid-Rendon. CS-2 informed agents that Del Cid-Rendon had numerous additional baggies of methamphetamine in the Durango ready for sale.

Surveillance units remained in the vicinity of Los Compadres to continue surveillance of Moreira and his counterparts. At approximately 7:40 p.m., agents observed a Lexus pull into the parking lot on the west side of Los Compadres. Agents observed the driver of the Lexus exit his vehicle and enter the Dodge Durango. After several minutes, the driver of the Lexus exited the Durango and left the area in his vehicle. Law enforcement officers attempted to followed the Lexus, but they lost contact with the vehicle as it traveled southbound on Interstate 635.

At approximately 8:45 p.m., agents observed a red Chevrolet Blazer pull into the Los Compadres parking lot. At approximately 8:50 p.m., agents observed an unknown Hispanic male walk towards the Dodge Durango. Agents observed the Hispanic male signal to the two males sitting in the red Blazer (later identified as Justin Bollig and Christopher Greene). Officers observed Greene exit the passenger side of the Blazer, walk around to the front passenger side of the Durango and enter the Durango. Approximately two minutes later, agents observed Greene exit the Durango and get back into the Blazer, at which time the Blazer left the parking lot. Officers followed the Blazer eastbound on State Avenue and Officer Chris Blake of the Kansas City, Kansas Police Department ("KCKPD") and Deputy Valdez initiated a vehicle stop.[1] Some eight minutes after agents stopped the Blazer, Deputy Valdez announced over the KCKPD radio that he had recovered approximately two ounces of crystal methampethamine and that other officers should be informed of his finding.[2]

---

[1] Officers obtained verbal and written consent from Bollig to search the vehicle. Two baggies containing 26.3 grams of "ice" methamphetamine were located in the Blazer. Greene was interviewed and indicated that he had purchased the methamphetamine for $1,600.00 and that he had purchased methamphetamine at Los Compadres approximately seven times in the past few months.

[2] The KCKPD radio was not connected to the DEA radio. Accordingly, there was some
(continued...)

At approximately 8:50 p.m., agents observed a purple Nissan Altima, registered to Victor Galvan (later identified as defendant's father) of Kansas City, Kansas, park in the lot at Los Compadres. Agents saw a Hispanic male (later identified as defendant) exit the Nissan and enter the front passenger side of the Durango. Approximately two to three minutes later, agents saw defendant exit the Durango, enter the Nissan and depart the area. DEA Agents Michael Sanders and John Fremgen followed the Nissan eastbound on State Avenue, to southbound Interstate 635, onto eastbound Interstate 70, at which time the agents conducted a vehicle stop near the off ramp at 7th Street.

The agents approached the vehicle and asked defendant to turn off his vehicle. He refused to do so. The agents asked defendant for his driver's license, registration and proof of insurance. Defendant recognized the agents as law enforcement officers, but he refused to produce the requested documentation.[3] Agent Fremgen then asked defendant to step out of his vehicle. Defendant refused to do so, and agents forcibly removed him from his vehicle. Agent Fremgen asked defendant if he was carrying any contraband or weapons and defendant replied, "No." Agents proceeded to conduct a pat down of Galvan. Agent Fremgen testified that individuals often store narcotics or other contraband in their genital area, and during the pat down, defendant pulled away suddenly as Agent Fremgen searched defendant's mid section. At

---

[2](...continued)
delay in the transmission of this information to DEA agents who conducted a traffic stop of defendant's vehicle.

[3] At the hearing, defendant testified that he did not know who was pulling him over. In his statement to police later that evening, however, defendant said that he stuffed the methamphetamine into his crotch area because he felt that someone was following him on Interstate 70. In addition, defendant testified that the agents' vehicles had "police lights" in front and agents testified that they had identification badges. Therefore the Court finds that defendant understood that the individuals who pulled him over were law enforcement officers.

one point during the pat down, defendant jerked up his leg. At that point, Agent Fremgen believed that defendant was concealing narcotics in the genital area of his body.[4]

Agent Sanders handcuffed defendant for further investigation and for agent safety. Agent Fremgen turned off defendant's car. As he did so, he saw what appeared to be a knife between the console and the driver's seat. Agent Sanders placed defendant in the back seat of his official vehicle. Agent Fremgen asked defendant if he had any weapons in his vehicle and defendant replied "No." Agent Fremgen then went back to defendant's vehicle and retrieved a large spring-loaded knife, commonly referred to as a switchblade, in the area between the console and the driver's seat. Shortly thereafter, Agent Fremgen received a radio report that officers had recovered two baggies of methamphetamine from the Blazer.[5]

Agents arrested defendant for possession of an illegal weapon. A canine search of the vehicle did not result in the discovery of any contraband.[6] Agents transported defendant to the Wyandotte County Jail to conduct a full strip search. Before the search, defendant admitted that he did in fact have

---

[4] At the hearing, defendant admitted that he "wiggled around a little bit" because he did not want officers to find the drugs in his crotch area.

[5] Agent Fremgen testified that he learned this information shortly before they pulled over defendant's vehicle. Agent Sanders, however, testified that Agent Fremgen learned this information shortly after he found the knife in defendant's vehicle. This apparent discrepancy may be explained if Agent Fremgen learned limited information about the stop of the Blazer before agents stopped defendant's vehicle and then heard further detail of the stop of the Blazer after he discovered the knife. The discrepancy appears to be innocent misrecollection by one or both of the agents. In any event, for purposes of defendant's motion, the Court assumes that Agent Sanders has correctly recalled the chronology.

[6] Defendant testified that after the dogs could not find any drugs, officers discussed letting him go, but then they heard some radio conversation which changed their minds. Defendant maintains that at that point, officers went back to search the car and discovered the switchblade. The Court rejects defendant's testimony on this issue. Agents discovered the switchblade shortly after they handcuffed defendant.

methamphetamine concealed in his crotch area and gave officers a baggie containing "ice" methamphetamine.

At the hearing, defendant admitted that during the traffic stop he lied to officers about whether he had drugs or weapons and that at the police station that evening, he told officers additional lies about his involvement in drug trafficking.

## Analysis

Defendant argues that officers did not have reasonable suspicion or probable cause to stop his vehicle and that they lacked probable cause to conduct a subsequent search of his vehicle.[7]

**I.   Traffic Stop**

Defendant argues that officers did not have reasonable suspicion or probable cause to stop his vehicle and investigate him. Defendant argues that the methamphetamine obtained from his person and his statement later that evening were fruits of his unlawful detention and should be suppressed.

The Tenth Circuit has defined three categories of police/citizen encounters: (1) voluntary cooperation in response to non-coercive questioning; (2) investigatory; and (3) arrest. United States v. Muldrow, 19 F.3d 1332, 1335 (10th Cir.) (citing United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir.), cert. denied, 467 U.S. 1255 (1984)), cert. denied, 513 U.S. 862 (1994); see Terry v. Ohio, 392 U.S. 1 (1968). This case involves the second category: an investigatory or Terry stop. See United States

---

[7]   In his initial motion, defendant also claimed that (1) officers lacked probable cause to arrest him, (2) officers lacked a legal basis to tell him after the arrest that they were going to strip search him for narcotics; and (3) he did not voluntarily waive his rights at the police station. See Motion To Suppress Evidence And Statements (Without Suggestions) (Doc. #112) filed March 29, 2006. Based on subsequent briefing and defense counsel's statements at the hearing, the Court construes defendant's motion as challenging only the agents' decision to pull over the vehicle and subsequently search that vehicle.

v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005) (traffic stops are seizures analogous to investigative detentions).

In deciding whether an investigatory detention is permissible, the Court must determine both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Law enforcement officers may stop and briefly detain a person for investigative reasons if the officer has a reasonable suspicion that criminal activity may be afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989). After an officer resolves the concern that justified the initial stop, any further detention must be supported by a reasonable suspicion of criminal activity. See United States v. Alarcon-Gonzalez, 73 F.3d 289, 292-93 (10th Cir. 1996). Thus, "reasonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout." United States v. Soto-Cervantes, 138 F.3d 1319, 1322 (10th Cir.), cert. denied, 525 U.S. 853 (1998). There must be "specific and articulable facts" to support a finding of reasonable suspicion; an "inchoate and unparticularized suspicion or 'hunch'" is inadequate. Terry, 392 U.S. at 21. Moreover, "whether . . . an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend on any one factor but on the totality of the circumstances." United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993). The Court evaluates the officer's conduct "in light of common sense and ordinary human experience," deferring to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Stephenson, 452 F.3d 1173, 1176 (10th Cir. 2006) (internal quotation marks and citations omitted).

Here, based on the following facts which they knew, officers had reasonable suspicion that defendant was involved in criminal activity known to them:

1. At approximately 7:25 p.m. on December 19, 2005 as part of a controlled purchase by DEA agents, CS-2 purchased four individual baggies which appeared to contain methamphetamine from a Hispanic male in a dark colored Dodge Durango parked in the parking lot of the Los Compadres restaurant in Kansas City, Kansas. CS-2 told officers that one of the individuals in the Durango was Del Cid-Rendon who officers recognized as a supplier of methamphetamine in a prior controlled purchase by CS-1. CS-2 reported that Del Cid-Rendon had numerous additional baggies of methamphetamine in the Durango ready for sale.

2. Immediately before the controlled purchase, officers saw an individual from a grey Ford pickup exit his vehicle, meet briefly with one of the individuals in the Durango, and then leave the area.

3. Immediately after the controlled purchase, at approximately 7:40 p.m., officers saw a Lexus pull into the parking lot of Los Compadres. The driver of the Lexus entered the Durango for several minutes, and then went back to his vehicle. The Lexus immediately left the area at a high rate of speed and was able to evade law enforcement officers.

4. At approximately 8:45 p.m. that same evening, officers saw a Chevrolet Blazer pull into the parking lot of Los Compadres. An unknown Hispanic male (later identified as Christopher Greene) exited the Blazer and entered the Durango. After some two minutes, agents observed Greene exit the Durango and enter the Blazer. Officers followed the Blazer as it left the area.

5. At approximately 8:50 p.m. that same evening, officers observed a purple Nissan pull into the parking lot of Los Compadres. Defendant exited the Nissan and entered the Durango. Approximately three minutes later, agents saw defendant exit the Durango and enter the Nissan. Defendant immediately left the parking lot.

Defendant argues that his mere presence inside the Durango for a short period of time can be as consistent with reasonable legal activity as it is with the purchase of drugs. Defendant Victor Galvan's Reply To The Government's Supplemental Suggestions In Opposition To Motion To Suppress Physical Evidence and Statements (Doc. #223) filed September 18, 2006 at 2. Under the circumstances of this case, the Court tends to disagree. Even so, "Terry accepts the risk that officers may stop innocent people." Illinois v. Wardlow. 528 U.S. 119, 126 (2000). Even though an individual's conduct may be

ambiguous and susceptible of innocent explanation, officers may detain individuals to resolve the ambiguity. Id. at 125; cf. United States v. Reid, 997 F.2d 1576, 1579 (D.C. Cir. 1993) (greater likelihood that person in small private residence containing drugs will be involved in drug activity occurring there than individual who happens to be in tavern where bartender is suspected of possessing drugs), cert. denied, 510 U.S. 1132 (1994); United States v. Harvey, 897 F.2d 1300, 1304 (5th Cir. 1990) (driving up next to drug house during search established reasonable suspicion), overruled in part on other grounds by United States v. Lambert, 984 F.2d 658 (5th Cir. 1993). Based on the totality of the circumstances, officers had an objectively reasonable and articulable suspicion that defendant was involved in criminal activity and they were justified in stopping defendant's vehicle to question him.

## II.     Recovery Of Knife – Plain View Exception

After officers stopped defendant's vehicle, they could detain defendant only so long as they had reasonable suspicion of criminal activity. See Alarcon-Gonzalez, 73 F.3d at 292-93. Here, the officers immediately asked defendant to turn off his vehicle and produce identification, but he refused to do so. At that point, the officers were justified in removing defendant from his vehicle and conducting a pat down of defendant for their safety and further investigation. See United States v. Garcia, 459 F.3d 1059, 1064 (10th Cir. 2006) (individual's involvement with drug transactions or distribution can support reasonable suspicion to frisk individual for weapons); United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (when officer has reasonable suspicion that illegal drugs are in vehicle, absent factors allaying his safety concerns, he may order occupants out of vehicle and pat them down briefly for weapons to ensure officer safety and safety of others). Based on defendant's conduct during the pat down and his failure to comply with the agents' demands, Agent Fremgen reasonably believed that defendant was attempting to conceal

narcotics in the genital area of his body. Accordingly, officers had reasonable suspicion to detain defendant for further investigation. As Agent Sanders secured defendant, Agent Fremgen turned off defendant's vehicle and observed in plain view what appeared to be a knife in between the console and the driver's seat.

Under the "plain view" exception to the exclusionary rule, a police officer may properly seize evidence of a crime without a warrant if (1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent, i.e. the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself. United States v. Carey, 172 F.3d 1268, 1272 (10th Cir. 1999); United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996). Agent Fremgen's seizure of the knife meets all of these requirements. When he reached in the vehicle to turn it off, Agent Fremgen was lawfully in a position to observe the knife. The switchblade's incriminating character was immediately apparent because such weapons are illegal to possess in Kansas. See K.S.A. § 21-4201(a)(1). Finally, Agent Fremgen had a lawful right of access to the switchblade because he believed that such a knife was illegal to possess under Kansas law. See Soldal v. Cook County, Ill., 506 U.S. 56, 68 (1992) (seizure of property in plain view without warrant authorized only when probable cause exists to associate property with criminal activity).

After Agent Fremgen found the knife, agents had probable cause to arrest defendant for possession of an illegal weapon. See United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998) (probable cause to arrest when officer has learned facts and circumstances through reasonably trustworthy information which would lead reasonable person to believe that offense had been or was being committed by person

arrested). Thereafter, defendant voluntarily produced the methamphetamine from his genital area and gave officers a statement about his involvement in drug trafficking. In sum, Agent Fremgen lawfully discovered the knife in plain view. The Court therefore overrules defendant's motion to suppress.

### III.    Recovery Of Knife – Probable Cause To Search Vehicle

Law enforcement officers ordinarily must obtain a warrant, based on probable cause, before conducting a search. See New York v. Belton, 453 U.S. 454, 457 (1981). The Supreme Court has recognized an "automobile exception" which has no exigency requirement. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). If a car is readily mobile and officers have probable cause to believe that it contains contraband, the Fourth Amendment permits them to search the vehicle. Id.; see Maryland v. Dyson, 527 U.S. 465, 466-67 (1999). Probable cause is measured against an objective standard; hence, the subjective belief of an individual officer as to probable cause is not dispositive. United States v. Davis, 197 F.3d 1048, 1051 (10th Cir. 1999). In determining whether probable cause exists, an officer may draw inferences based on his own experience. United States v. Mercado, 307 F.3d 1226, 1230 (10th Cir. 2002).

Even if Agent Fremgen had not observed the knife in plain view when he turned the vehicle off, he had probable cause to search the vehicle for narcotics and/or weapons at that point. In United States v. Artez, 389 F.3d 1106 (10th Cir. 2004), the Tenth Circuit held that officers had probable cause for a search warrant of a house based on (1) a tip from a confidential informant that methamphetamine was being distributed at defendant's residence; (2) the successful execution of two controlled buys of methamphetamine from the residence; (3) a tip from an anonymous informant to a different police unit that methamphetamine was being distributed at the residence; (4) the results of surveillance of the residence

which indicated a series of visitors staying for short periods of time, consistent with drug trafficking activity; and (5) the narcotics-related criminal histories of four inhabitants or frequent visitors of the suspect residence, including an active arrest warrant against one of these individuals for possession of drug paraphernalia. Id. at 1114; see also United States v. Corral, 970 F.2d 719, 727 (10th Cir. 1992). Many of the same factors are present in this case. They include (1) a successful controlled buy of methamphetamine from Del Cid-Rendon some six weeks earlier; (2) a successful controlled buy of methamphetamine from Del Cid-Rendon in the parked Dodge Durango some 80 minutes earlier; (3) the statement of CS-2 that Del Cid-Rendon had numerous additional baggies of methamphetamine in the Durango; and (4) surveillance by officers which indicated a series of individuals stopping in the parking lot, entering the Durango for some three minutes and then immediately leaving the area in their own vehicles. In addition, before the officers searched defendant's car, they observed that (1) defendant did not comply with requests to turn off his vehicle and produce his driver's license, proof of insurance and vehicle registration; and (2) defendant pulled away and jerked his leg in a manner which suggested to a trained officer that he was concealing contraband in his genital area. Based on the totality of circumstances, officers had probable cause to believe that defendant's vehicle contained contraband.

Once probable cause is established, an officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband. United States v. Ross, 456 U.S. 798, 825 (1982). Agent Fremgen therefore rightfully recovered the switchblade, whether it was located under the driver's seat, as defendant maintains, or between the console and the driver's seat, as the officers maintain. Because the search of defendant's vehicle was proper under the so-called "automobile exception" to the exclusionary rule, the Court overrules defendant's motion to suppress.

- 13 -

**IT IS THEREFORE ORDERED** that <u>Defendant's Motion To Suppress Evidence And Statements</u> (Doc. #112) filed March 29, 2006 be and hereby is **OVERRULED**.

Dated this 8th day of November, 2006, at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge